WILLIAMS v. KANSAS CITY, MO., et al.

No. 7078.

United States District Court
W. D. Missouri, W. D.
April 8, 1952.

Carl R. Johnson, Almer T. Adair, Kansas City, Mo., Thurgood Marshall, Robert L. Carter, New York City, for plaintiffs.

David M. Proctor, City Counselor, Benj. M. Powers, John J. Cosgrove, Associate City Counselors, Kansas City, Mo., for defendants.

RIDGE, District Judge.

Plaintiffs, citizens of the United States, of the State of Missouri, and resident taxpayers of Kansas City, Missouri, invoke the jurisdiction of this court under Sections 1331, 1343(3), and 2201, T. 28, U.S.C.A., seeking redress, by way of declaratory judgment and injunction for claimed deprivation, under color of state law, of rights, privileges and immunities secured to them by the Fourteenth Amendment to the Constitution of the United States, and Sections 41 and 43, T. 8, U.S.C.A.

Defendant Kansas City, Missouri, is a municipal corporation having a special charter by virtue of the Constitution and laws of the State of Missouri. Defendant William E. Kemp is Mayor; defendants R. Carter Tucker, Vincent Hagerty, and Frank Theis constitute the Board of Park Commissioners; and defendant J. V. Lewis is Superintendent of Parks, of said City.

Under Section 55 of the Charter of Kansas City, Missouri (1925) the Board of Park Commissioners has superintending, control and management of all parks, boule-

vards, and playgrounds belonging to or under the control of the City, with power to improve, regulate, and maintain the same. "The Council (of said City has) power, and it (is) its duty upon recommendation of (said) board, to pass ordinances for the regulation and orderly government of parks * * * playgrounds, and to prescribe fines and penalties for the violation" thereof. Sec. 55, Charter of K.C., supra. In conjunction with the parks and playgrounds owned by the defendant City, the Board of Park Commissioners, supra, maintains and operates three outdoor major swimming pools, one located in Swope Park, built in 1942; one in Parade Park, built in 1939; and one in Grove Park, built about forty years ago. In addition thereto, four junior swimming pools are maintained in other parks of the City. Five of the seven swimming pools so maintained and operated by the City have been, by custom of the Board of Park Commissioners, devoted exclusively to use by persons of the Caucasian race. The major pool at the Parade Park and junior pool at Crews Park have been set aside exclusively for use by Negroes.

Swope Park, owned by Kansas City, Missouri, composed of 1,800 acres, is the main outdoor recreational area of that city. There are many concessions and facilities therein for enjoyment and use of the general public; to mention but a few, boating, bathing, golf, zoo, band pavilion, shelter houses, Starlight Theatre, and picnic facilities. All persons, without distinction or discrimination of any sort, are admitted to that park at any time. The facilities therein, when seasonably open, may be used and enjoyed by the public generally, regardless of race or color—except the swimming pool located therein.

The Swope Park swimming pool was completed in 1942 as a W.P.A. project. The total cost was $534,544.40, of which amount the City of Kansas City contributed $125,000 in cash and $50,102.83 in supervision and labor costs. Modern in every respect, it has been cited as a model for swimming pool construction. For better control of swimmers and as a safeguard against accident, three separate pools are maintained therein, designed for diving, swimming, and wading. The diving pool is 40 feet wide by 70 feet long, with a depth of 11 feet. Three diving boards located therein are standard A.A.U. equipment. An observation tunnel, running the full length of one side of the diving pool, has portholes through which spectators may observe divers in action. The swimming pool is 105 feet wide by 165 feet long, with a depth of 3½ to 5 feet. This pool is also built to meet A.A.U. specifications. The wading pool is 40 feet wide by 70 feet long, and ranges in depth from 1½ to 2½ feet. It is enclosed from the other pools by a fence to provide greater protection for small children using the same. The three pools have a capacity of 750,000 gallons of water. A modern filtration plant provides a complete change of water in the pools every eight hours. A one-story bathhouse 305 by 45 feet, constructed of native stone, provides accommodations for 3,024 bathers at one time. Separate dressing rooms are maintained for female and male bathers. The ladies' dressing room is provided with partitions with curtains, hair dryers, and powder room. The pool has an operating staff of 40 people. A first aid station is open at all hours. Night lighting of the pool, both above and below the water, adds to safety as well as general usefulness of the pool, and makes the pool an attractive night spot for bathers. A modern soft drink and concession stand is operated in connection with the pool, adding to the comfort and pleasure of bathers. An' admission fee of 40 cents for persons over 12 years of age, and 20 cents for children under 12 years, is made by the City for entrance into the pool. The largest single day's attendance of record since this pool was opened was 6,550 paid admissions. 94,400 white persons paid admission to the pool during the year 1951. In addition thereto, certain "free" mornings each week are furnished to under-privileged white children.

On June 20, 1951, plaintiffs, Negroes, of full age, good character, and sound health, went to the Swope Park swimming pool, during the hours when said pool was open and being used and enjoyed by white per-

sons, tendered their admission for tickets entitling them to enter said pool, and sought to gain admission to the pool to swim. They were denied admittance to such pool for swimming, by employees of the defendant City in charge of the operation thereof, solely on account of their race and color. At the time and after plaintiffs so presented themselves, tendered admission fees and were denied admittance to said pool, other white persons purchased tickets and were admitted to use, enjoy, and swim in the pool. Thus does the claim here made by plaintiffs arise—that defendants, acting by and through their duly authorized agents and servants, acting under color of state law, have discriminated against the plaintiffs, solely on account of their race and color in violation of the Constitution and laws of the United States, supra.

Responding to the claim so made by plaintiffs, defendants, admitting the facts above stated, contend that their refusal to admit plaintiffs to the use and enjoyment of said pool was not in anywise illegal or unlawful, or a denial to plaintiffs of any rights secured to them under the Fourteenth Amendment of the Constitution or laws of the United States, or that plaintiffs have been injured as a result of such action. In defense of their conduct and action, defendants the Board of Park Commissioners assert that use of the outdoor swimming pools maintained by the defendant Kansas City are, by custom and usage of the Board of Park Commissioners of said City, reserved for enjoyment and use by the general public as follows: The major swimming pools at Swope Park and the Grove, and junior pools at Lykins Square, Ashland Square, and Central Park, are reserved for use of members of the Caucasian race—the major pool at Parade Park and the junior pool at Crews Park are reserved for use and enjoyment of Negroes. Defendants assert that segregation of the races in the use of said facilities is not in violation of the Fourteenth Amendment to the Constitution of the United States, because the facilities so provided are substantially equal and attractive in surroundings, appointments, equipment, sanitation, maintenance, and service; that said Board,

as agents of the defendant City, provides separate outdoor swimming pool facilities for the two races, not for the purpose of discriminating arbitrarily against the plaintiffs on account of their race or color, but because as an arm of the State it has the duty and responsibility under the police power to preserve peace and order in the community for the protection and welfare of both races and in the interest of public safety to prevent racial conflicts, riots, and violence.

■ To more pointedly shape the issue herein, we should here state that no evidence was introduced in this trial that the custom of segregation here considered is premised in the police power of the defendant City, or for the purpose of maintaining peace and good order in the community. Had proof thereof been attempted, we do not believe that it would have presented a legal defense to the constitutional claim here made by plaintiffs. "Thirty-four years ago, in passing on the constitutionality of a municipal ordinance requiring residential segregation, the Supreme Court indicated what the attitude of the courts should be towards the question of race violence" when proffered as an issue in an action such as the one at bar. Racial Violence and Civil Rights Law Enforcement, Vol. 18, No. 4, U. of Chi.L.Rev. In Buchanan v. Warley, 245 U.S. 60, 81, 38 S.Ct. 16, 20, 62 L.Ed. 149, Mr. Justice Day said:

"It is urged that this proposed segregation will promote the public peace by preventing race conflicts. Desirable as this is, and important as is the preservation of the public peace, this aim cannot be accomplished by laws or ordinances (or customs) which deny rights created or protected by the federal Constitution." (Parentheses added.)

See also Judge Hulen's opinion in Draper v. City of St. Louis, D.C., 92 F.Supp. 546.

Defendants further assert that their policy of operating separate swimming pools for the two races is reenforced by a recognized natural aversion to physical intimacy inherent in the use of swimming pools by members of races that do not

mingle socially. This policy, they say, conforms to a custom long established in the local community of separate institutions, services, and facilities for white persons and Negroes; that, based on the experience of other communities, the use of the same swimming pool facilities of the defendant City by both races would produce a condition detrimental to the best interests of both races.

■ Defendants by their briefs herein do not undertake to sustain such contention as a proposition of law. That it cannot be so sustained was decided by the Supreme Court 57 years ago in the case of Gibson v. Mississippi, 162 U.S. 565, 591, 16 S.Ct. 904, 910, 40 L.Ed. 1075, where it is said:

"All citizens are equal before the law. The guaranties of life, liberty, and property are for all persons, within the jurisdiction of the United States, or of any state, without discrimination against any because of their race. Those guaranties, when their violation is properly presented in the regular course of proceedings, must be enforced in the courts, both of the nation and of the state, without reference to considerations based upon race. In the administration of * * * justice no rule can be applied to one class which is not applicable to all other classes."

Natural aversion to physical intimacy among persons of different race, or their right to associate with each other, contain no legal issues that may be considered or determined in this action. Such matters are within the province of ethics which deals with the science of moral duty and human actions. This juridical action deals with matter in relation to the law of the land. The argument so made by defendants, which it can only be considered, is scarcely worthy of legal attention. It provides a court with no legal guide to the principles of law here involved.

Defendants concede that plaintiffs have an individual constitutional right to enjoy all facilities owned and operated by the defendant City. But they assert: "The Constitution of the United States does not guarantee to (plaintiffs) the privilege of personal association with members of the white race against their wish and consent and any attempt by compulsion of law to deny white persons the right to refuse personal association with others than white persons is an unconstitutional denial of the constitutional civil rights of such (white) persons."

In their briefs (p. 11) defendants state: "Whatever rights plaintiffs might have to swim in the Swope Park pool are not rights to buy tickets, but rights to enter the pool (upon compliance with defendants' rules) unless substantially equal facilities have been provided elsewhere for members of the colored race. And this is the single issue in this case," they say. In light of defendants' conception of the issues herein so tersely stated, and the fact that their briefs are practically devoted to "separate and equal" arguments, we shall consider the foregoing non-legal contentions are abandoned by defendants. We do not agree with defendants, however, that the issues tendered by the complaint are singular, as above claimed.

■ Defendants also challenge plaintiffs' right to maintain this suit as a class action; attack their good faith in bringing the same, and charge that this litigation was inspired by persons not citizens of defendant City to obtain a judicial decree pronouncing abstract constitutional rights, or to stir up strife and racial conflict in a period of national emergency. Plaintiffs' claim herein must be recognized as presenting a justiciable controversy relating to constitutional rights. "So doing their motive and good faith" in bringing this action is irrelevant. Johnson v. King-Richardson Company, 1 Cir., 36 F.2d 675, 67 A.L.R. 1465; State ex rel. Bluford v. Canada, 348 Mo. 298, 153 S.W.2d 12; State ex rel. Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208.

In addition to the facts above stated, the evidence before the court establishes that the Board of Park Commissioners of Kansas City, Missouri, as an autonomous body within the charter framework of said City, without formal official action, but only by custom followed by said Board, now

854

enforces segregation of the races in the use and enjoyment of swimming facilities located in the public parks of Kansas City, Missouri. Since the establishment of the Swope Park swimming pool, hearings have been held by said Board regarding the use thereof by whites and Negroes. No formal rule or regulation has ever been adopted regarding that subject by said Board after such hearings. The Board has been content to enforce segregation of the races in their use and enjoyment of such public facility solely on the ground that someone (the evidence does not establish who) permitted only members of the Caucasian race to use and enjoy certain of the swimming pools maintained by the defendant Kansas City, Missouri, and permitted only Negroes to use and enjoy other such facilities. With such a beginning the present Board of Park Commissioners of Kansas City, Missouri, continues to enforce, through its employees, segregation of white and Negro citizens of Kansas City, Missouri, in the use and enjoyment of swimming pools owned and controlled by the City. No reason is given by said Board as to why it has not formally enacted or published any written rule, regulation, or decision regarding that subject. Its attitude may be summed up in the words of its present Chairman as follows:

"A. * * * As far as rules are concerned, I repeat it is just a matter of custom at the present time.

"Q. And no written regulations on it? A. Not to my knowledge, no.

"Q. What decision was made after the consideration and hearings? A. The decision of the Board on that after the hearings was that the matter would be adjudicated as we understood it, because we were told that there would be a suit brought against the Park Board.

"Q. So you left it up to the Court? A. That is correct."

■ It should be pointed out now that the Board of Park Commissioners, as an independent agency under the charter of Kansas City, Missouri, is not subject to control or supervision of the Mayor of said City, or its City Manager. The latter mentioned officials of the City are brought into official contact with said Board only through appointive power resident in the Mayor, and in regard to fiscal matters controllable by the City Manager. Otherwise the Mayor and City Manager of the City have no control over the administrative functions of such Board. As a consequence thereof the defendant William Kemp, as Mayor of Kansas City, Missouri, is not a necessary or proper party in the instant action. He is not connected, in the evidence or by operation of law, with the subject matter thereof.

Separation of races is not normal treatment by Kansas City, Missouri. Under date of May 29, 1951, prior to the bringing of this action, the City Council of said City, meeting informally, agreed upon a policy which provides for a non-segregation clause to be included in all leases of city-owned facilities to which the public generally is admitted by the lessees. The policy applies particularly to segregation of Negroes and white persons. The statement issued by the Council is as follows:

"All future leases, and existing leases which can be voluntarily amended, for affairs at the Municipal Auditorium or at any other municipally-owned facility to which the general public is invited or admitted and tickets for admission offered for sale at a box office, either on City property or elsewhere, and all other leases covering City-owned facilities to which the general public is invited, shall contain a provision prohibiting the segregation of persons by races. However, this policy does not apply to any group or organization leasing City-owned facilities where use or admittance shall be limited to members and/or invited guests by ticket sold or distributed by any such group or organization to members and/or invited guests and which are not for sale to the general public at any box office or ticket agency." (Ex. 19.)

In light of that policy the City Manager of Kansas City, Missouri, has instructed each department head of the City to review

all existing leases to which that policy applies, and each department head is held by the City Manager to be responsible for carrying that policy into effect. Since the promulgation of such policy all departments of the government of Kansas City, except the Board of Park Commissioners, adhere thereto. Notwithstanding the provisions of the foregoing resolution of the Council of Kansas City, the Board of Park Commissioners has not wholly followed such policy of non-segregation. It applies it to all facilities and functions under its control except as to swimming pools. Since adoption of the aforesaid policy, Negroes and white persons have been admitted to all functions conducted and carried on in City-owned facilities except swimming pools, without confusion, disorder, or breach of the peace ensuing.

The Parade Park swimming pool, that defendant Board of Park Commissioners has by custom designated for exclusive use of Negroes, was built in 1939 at a total cost of $60,000. No charge is made for admission to swim in that pool. Those admitted thereto, who wish to check valuables while swimming, may do so at a charge of 10 cents. The 1951 season attendance at that pool was 59,478. The size of said pool is 105 by 45 feet, holding 131,500 gallons of water, ranging in depth from two to nine feet. Water from the same sources as the Swope Park pool is used therein. The total personnel, all Negroes, in attendance at that pool number 22. Said pool is situate in an area in Kansas City predominantly occupied by Negroes, being approximately 4½ miles from the Swope Park pool. (The Grove pool, designated by the Board for exclusive use of white persons, is one mile east of the Parade Park pool and equal distance from the Swope Park pool.) Mostly children patronize the Parade Park pool, though Negro adults are freely admitted. 250 persons is the maximum number that the Parade Park pool can accommodate at any given time. Diving is permitted in said pool in a roped-off area, but when the pool is capacity full, diving is somewhat restricted. The length of time Negro persons may swim at the Parade pool is limited. There is no such time limit on white swimmers using the Swope Park pool. On hot days the pool in Parade Park is more over-crowded than the pool at Swope Park. The building housing the pool is of cut stone construction, originally built as a community center. It is neatly maintained. Separate dressing rooms for men and women are contained therein. Regulation A.A.U. facilities and concessions found at the Swope Park pool are not to be found at the Parade pool. Fixtures in the women's dressing room at Swope Park are not substantially comparable to those at the Parade Park pool. The Swope Park pool is provided with a sunning beach of sand. The Parade Park pool has no such beach. The setting and appointments of the Parade pool are much less attractive than those of the Swope Park pool. The cost to the City of operating the Parade Park pool in 1951 was $14,197.48. The total cost of operation thereof for a five-year period from 1947 to 1951 was $53,881.75. (Since its completion in 1942 the Swope Park pool has produced revenue to the City, from admission fees, totalling $53,575.23 in excess of the total cost of operation, maintenance, and repairs.)

The Parade pool, restricted as to use by Negroes, and the Grove Park pool, restricted to use of white persons only, are 14 blocks apart. The area in Kansas City, Missouri, predominantly occupied by Negroes, abuts the immediate site of the Grove Park pool and wholly surrounds the Parade Park pool. Negroes living adjacent to the Grove Park pool, in the immediate residence district to white persons, can only use the swimming facilities provided by the defendant City at the Parade Park. White persons living in the same immediate residence area may use and enjoy swimming facilities provided by the City either at Grove Park or Swope Park. Negroes attending Swope Park on pleasure trips, or where most major outdoor attractions are held in the City, at the same time white persons do, must travel 4½ miles to use or enjoy swimming facilities owned

856

and controlled by Kansas City, while white persons attending Swope Park at the same time for the same purpose may use the swimming pool located therein.

Statistically, the area for swimming in the Parade Park pool is approximately 16 percent of the total swimming area of the three major pools in Kansas City. Said City had a total population April 1, 1950, of 456,622, of which 55,682 were Negroes. Thus for one-eighth of the population of Kansas City, one-sixth of the total major swimming pool area is provided for Negroes. If the population figures introduced by defendants herein have any relevance to the issues in this case, it would seem to be on the question of crowding at the swimming pools mentioned, as such factor could only be considered with the actual attendance records for the pools as compared with their size. Equality between individual citizens, and not equality between segments of the City's population, is the issue herein. During the five years for which defendants have submitted records, the comparative attendance at the Swope Park pool and the Parade Park pool, in thousands, is as follows: 1947, 219 against 64; 1948, 152 against 32; 1949, 93 against 48; 1950, 107 against 60; 1951, 94 against 59 (Deft. Ex. X and W). The Parade Park pool has had consistently smaller attendance; but since the Swope Park pool is about 3.7 times as large as the Parade Park pool (even if one omits the diving and wading pools at Swope Park), it appears that, during the last three years, the Parade pool has been considerably more crowded than the Swope Park pool. The only year in which the Parade Park pool has been less crowded was in 1948. In that year the Parade Park pool was closed on 21 days during the season when the Swope Park pool was open. (Deft. Ex. X and W.) Attendance records on the whole for said pools (Deft. Ex. U, V, W, and X), when analyzed as to daily attendance, reveal that on the average the Parade Park pool affords 6.44 square feet of water per person, in attendance during 1951, as against 13.39 square feet at the Swope Park pool. On days when the pools are crowded such figures are naturally reduced in proportion to the crowding.

## Findings of Fact

From the evidentiary facts above stated, and exhibits herein, the Court finds the ultimate facts to be:

■ The Board of Park Commissioners of Kansas City, Missouri, acting under color of state law, by custom, applicable only to the swimming pools owned and maintained by said City, enforces segregation of the races, in the use and enjoyment thereof. No ordinance of Kansas City, or law of the State of Missouri, authorizes said Board to enforce segregation of the races in the use and enjoyment of swimming facilities owned by Kansas City, Missouri.

That on June 20, 1951, plaintiffs, healthy and peaceful, qualified citizens of the United States, the State of Missouri, and resident taxpayers of Kansas City, Missouri, tendered to the agents, servants and employees of Kansas City, Missouri, the usual and customary charge exacted by defendant City for a ticket of admission to permit swimming in the Swope Park swimming pool; the agents, servants, and employees of said City, acting under direction of the defendant members of the Board of Park Commissioners of Kansas City, Missouri, who, acting under color of state law, refused to enter into contract with and sell to plaintiffs tickets of admission to said swimming pool, and refused to so contract with plaintiffs solely because of the Negro race and color of plaintiffs, at a time when like contracts were entered into with white citizens, who were then permitted to and used said pool and enjoyed the same.

■ The Parade Park swimming pool, constructed and maintained by defendant Kansas City for use and enjoyment of Negro citizens and resident taxpayers, is not substantially equal in character, location, appointments, and facilities generally, with major swimming pools constructed and maintained by said defendant, for use and enjoyment of white citizens and resident taxpayers of said City.

The City of Kansas City, Missouri, in all of its departments under the control of the City Manager of said City, has a policy of non-segregation between Negro and white persons at all functions therein,

and as to all facilities owned and controlled by said City. The Board of Park Commissioners of said City has a policy of non-segregation between Negro and white persons as to the use and enjoyment of all facilities under its control and management except swimming pools located in the public parks owned by Kansas City, Missouri.

Defendant Kansas City, Missouri, as an arm of the State of Missouri, acting through its duly constituted Board of Park Commissioners, who, acting under color of state law, vested in them, have refused to enter into contracts with plaintiffs and denied plaintiffs admittance to the Swope Park swimming pool, solely because of their race and color, although said Board recognizes the right to and enters into like contracts with white citizens, and permits white citizens to use and enjoy such public-owned and controlled facility.

## Conclusions of Law

Plaintiffs seek to maintain this action not only in their own right, but as a class action under Rule 23, Federal Rules of Civil Procedure, 28 U.S.C.A., for and on behalf of all other Negro citizens similarly situated who reside in Kansas City, Missouri. Without laboring that point, we rule that plaintiffs may maintain the instant action in their own behalf, but same cannot be presented as a pure class action. It is an elementary principle in constitutional law that it is the individual who is entitled to the equal protection of the law, and if he is denied a facility or convenience which, under substantially the same circumstances, is furnished to another citizen, the individual alone may complain that his constitutional privilege has been invaded, and he has no standing to sue for the deprivation of similar civil rights of others. This is so whether the other persons who may be injured are persons of the same race or occupation. McCabe v. Atchison, T. & S. F. Ry. Co., 235 U.S. 151, 35 S.Ct. 69, 59 L.Ed. 169; State ex rel. Gaines v. Canada, 305 U.S. 337, 351, 57 S.Ct. 232, 83 L.Ed. 208; Sweatt v. Painter, 339 U.S. 629, 635, 70 S.Ct. 848, 94 L.Ed. 1114; Mitchell v. Wright, D.C., 62 F.Supp. 580. There is no evidence before this court

that Negro citizens, other than plaintiffs, have ever tendered the admission price charged for swimming in the Swope Park pool and have been refused admittance solely because of their race or color. Such proof is essential to the individual plaintiffs' theory of action. Absent such proof, or offer to make proof to that effect, the thought of a class action being here maintained is dispelled; even though it may be assumed that had other Negro citizens so applied they likewise would have received the same treatment as did plaintiffs.

The legal issues decisive of those joined by the pleadings herein are (1) whether plaintiffs have been denied by Kansas City, Missouri, an arm of the State of Missouri, the right to make and enforce contracts, as that right is enjoyed by white citizens of said State and City, for admittance to the Swope Park swimming pool, owned and operated by said City; (2) whether defendants, under color of state law, have by custom subjected or caused plaintiffs to be subjected to deprivation of rights, privileges, or immunities secured to plaintiffs by the Constitution and laws of the United States; and (3) whether the acts of defendants claimed by plaintiffs to be discriminatory may be constitutionally defended under the "separate and equal doctrine" sometimes made applicable to the races.

Proceeding to such issues we declare the law to be:

Segregation of races in the State of Missouri is required by its Constitution and Statutes only in the following instances: Article IX, Sec. 1, Const. 1945, V.A.M.S., requires separate schools to be provided for white and colored children, except in cases otherwise provided by law; Article IX, Sec. 3 thereof, requires teachers in such schools to be paid the same salary, and have same training and experience. Sections 163.130, 165.117, and 175.050, RSMo 1949, V.A.M.S., make provision for attendance and establishment of separate schools for white and colored children and for maintenance of Lincoln University in said state. Inmates of Missouri Training School for Boys (a penal institution) are required to be maintained in separate cot-

tages by Sec. 202.620, RSMo 1949, V.A.M.S. Boards of education in said state have the power to establish and maintain separate libraries and public parks and playgrounds for the use of white and colored persons in such school districts. RSMo 1949, Sec. 165.327, V.A.M.S. And miscegenation is prohibited by Sections 451.020 and 563.240, RSMo 1949, V.A.M.S. No other segregation laws are to be found in the Constitution or on the statute books of said State. Thus the policy of the State of Missouri is to legalize segregation of races by Constitution and statute only in the above-mentioned categories. *Expressio unius est exclusio alterius.* Cf., however, Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 57 S.Ct. 232, 83 L.Ed. 208, as to the recognized legality of such segregation.

■ In the absence of a statute authorizing segregation of races, it has been held that segregation by local officials cannot be sustained. Westminster School Dist. of Orange Co. v. Mendez, 9 Cir., 161 F.2d 774, 780. In the State of Missouri a municipal corporation possesses and can exercise the following powers and no others: (1) Those granted in express words, (2) those necessarily or fairly implied in or incident to the powers expressly granted, (3) those essential to the declared objects and purpose of the corporation—not simply convenient, but indispensable. Any fair, reasonable doubt concerning the existence of power is resolved by the courts against the corporation and the power is denied. City of St. Louis v. J. E. Kaime, etc., R. E. Co., 180 Mo. 309, 314, 79 S.W. 140; State v. Butler, 178 Mo. 272, 312, 77 S.W. 560; City of St. Louis v. Bell Tel. Co., 96 Mo. 623, 10 S.W. 197, 2 L.R.A. 278; City of Independence v. Cleveland, 167 Mo. 384, 388, 67 S.W. 216; City of Joplin v. Jacobs, 119 Mo.App. 134, 138, 96 S.W. 219; Kennedy v. City of Nevada, 222 Mo.App. 459, 281 S.W. 56. In the absence of express authority to a municipal corporation, the power to confer exclusive privileges will not be implied as within its power. Cf. Town of Kirkwood v. Meramec Highlands Co., 94 Mo.App. 637, 644, 68 S.W. 761; Carroll v. Campbell, 108 Mo. 550, 557, 17 S.W. 884; City of Joplin v. Southwest Mo.

Light Co., 191 U.S. 150, 24 S.Ct. 43, 48 L.Ed. 127.

■ The Council of Kansas City is the authorized agent of the State, State v. De Bar, 58 Mo. 395, 397, and ordinances passed by it only have the force and effect of laws within the City, and a mere order or resolution of an officer or department of said City without action by the Council thereon is without authority and is void. Cf. Lockwood v. Wabash R. Co., 122 Mo. 86, 26 S.W. 698, 24 L.R.A. 516; Carroll v. City of St. Louis, 12 Mo. 444.

In the case at bar no statute of the State of Missouri, or ordinance of Kansas City, legally sanctions the custom of the Board of Park Commissioners of that city to enforce segregation of races in swimming pools or any other facility owned and operated by the City. In light of the authorities above cited the custom so enforced by said Board is without authority in state law.

■ The members of said Board apparently sustain such custom perforce the authority given to them under Chapter 55, supra, of the Charter of the City; i. e., the power to superintend, control, and manage the parks and facilities therein owned by the City. Presuming to so act, said Board is misusing the power possessed and entrusted to it by the Charter of Kansas City. In so doing, however, in enforcement of the custom of segregation here considered, such Board is acting under color of state law, which act is forbidden by the Fourteenth Amendment to the Constitution of the United States and Section 43, Title 8, U.S.C.A.

In Snowden v. Hughes, 1944, 321 U.S. 1, 11, 64 S.Ct. 397, 402, 88 L.Ed. 497, it is said:

"* * * state action, even though illegal under state law, can be no more and no less constitutional under the Fourteenth Amendment than if it were sanctioned by the state legislature. * * * illegality under the state statute can neither add to nor subtract from its constitutional validity."

See also Iowa-Des Moines Bank v. Bennett, 1931, 284 U.S. 239, 245–246, 52 S.Ct. 133, 76 L.Ed. 265; U. S. v. Classic, 1941,

313 U.S. 299, 325–326, 61 S.Ct. 1031, 85 L. Ed. 1368; Screws v. U. S., 1945, 325 U.S. 91, 107–113, 65 S.Ct. 1031, 89 L.Ed. 1495. In Home Telephone & Telegraph Co. v. City of Los Angeles, 1913, 227 U.S. 278, 286–287, 33 S.Ct. 312, 314, 57 L.Ed. 510, it is said:

"* * * the provisions of the (14th) Amendment * * * are addressed, of course, to the states, but also to every person, whether natural or juridical, who is the repository of state power. By this construction the reach of the Amendment is shown to be coextensive with any exercise by a state of power, in whatever form exerted."

Sec. 41, Title 8, U.S.C.A., provides in part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts * * * as is enjoyed by white citizens".

In the recent case of Valle v. Stengel, 3 Cir., 1949, 176 F.2d 697, it was held that said section applies to the activities of local officials who prevent Negroes from purchasing tickets to a swimming pool. Defendants seek to escape the effect of the Valle case, supra, on two primary grounds. First they argue that "the sale of a ticket to a place of amusement is not a contract but a license revocable at the will of the owner." (Deft.Br. p. 9.) On the contrary, it is rather universally held that a ticket holder to a place of amusement "may maintain an action for breach of contract" thereon when he is refused admittance after purchase. 62 C.J. 862, § 42. In Marrone v. Washington Jockey Club, 227 U.S. 633, 636, 33 S.Ct. 401, 403, Mr. Justice Holmes said "* * * the purchase of the ticket made a contract" and gave rise to a right "to sue upon the contract for the breach." In light of such decision, the point so raised by defendants must be ruled against them.

The second point made by defendants seeking to distinguish the Valle case, supra, is that a New Jersey statute was there involved. The last paragraph of that opinion rests, in part, upon a Civil Rights statute of New Jersey. Before reaching that paragraph, however, the court had already found a violation of Sec. 41, supra, and the Fourteenth Amendment. The statute to which defendants direct attention was raised in the Valle case as a defense, in an endeavor to establish no "state action". The court held, 176 F.2d at page 702, "The fact that Stengel, a law-enforcing officer, was acting in defiance of the law of New Jersey * * * will not serve as a defense * * *". The decision in the Valle case cannot be distinguished from the facts and issues in the case at bar on the ground that Missouri has no civil rights statute, as defendants attempt to do. Plaintiffs' contention here is not that the State of Missouri has not provided them with a right or remedy for violation of a contract entered into with private individuals. Plaintiffs here complain of direct state action; that is, that under color of state law, an arm of the State of Missouri refuses to permit them to make contracts with it, solely on account of plaintiffs' race and color, though that same arm of the State enters into similar contracts with white citizens. The authorities and the facts above found sustain a right of action herein in plaintiffs under the Fourteenth Amendment to the Constitution of the United States and Sec. 41, T. 8, U.S.C.A., because of such discrimination, and compel injunctive relief be granted to dispel such discrimination.

The finding of fact, supra, to the effect that swimming facilities provided by defendant City for use of Negroes are not substantially equal to those maintained and provided for white persons, also sustains a right of action in favor of plaintiffs under the Fourteenth Amendment and Sec. 43, T. 8, U.S.C.A. Particularly is that true when it appears that without authority of law the defendant Board of Park Commissioners refuses to permit plaintiffs to use and enjoy swimming facilities owned and controlled by the City in Swope Park, solely because of the race and color of plaintiffs. The custom or policy of such Board in enforcing segregation of races, as here considered, could only be valid, if valid at all, perforce some law or charter provision vesting in Kansas City, Missouri, power to separate

the races in the use of the City's swimming pools. There is no state law or charter provision vesting such power in Kansas City, Missouri. "It follows that the acts of (defendants) were and are entirely without authority of (Missouri) law, notwithstanding their performance has been and is under color or pretense of (Missouri) law." Westminster, etc. v. Mendez, 9 Cir., 161 F.2d 774, 780.

In light of defendants' concession regarding the main issue herein, that plaintiffs are recognized by defendants as having a constitutional right to enter and enjoy Swope Park swimming pool, if other swimming facilities owned and operated by the City for use of Negroes are not substantially equal thereto, it would unduly be laboring this opinion to further expatiate upon that subject. Suffice it to say substantially *unequal* facilities, as above found, owned and maintained by a state, or arm thereof, in attempted segregation of the races, has universally been held to do violence to the equal protection clause of the Fourteenth Amendment, under all circumstances. Valle v. Stengel, supra; Draper v. City of St. Louis, supra; Lawrence v. Hancock, D.C., 76 F.Supp. 1004; Lopez v. Seccombe, D.C., 71 F.Supp. 769; Kern v. City Commissioners of Newton, 151 Kan. 565, 100 P.2d 709, 129 A.L.R. 1156; Culver v. City of Warren, 84 Ohio App. 373, 83 N.E.2d 82; (all swimming pool cases); Missouri ex rel. Gaines v. Canada, supra; Sipuel v. Board of Regents of University of Okl., 332 U.S. 631, 68 S.Ct. 299, 92 L.Ed. 247; Oyama v. State of California, 332 U.S. 633, 68 S.Ct. 269, 92 L. Ed. 249; Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161; Hurd v. Hodge, 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187; Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114; McLaurin v. Oklahoma State Regents, 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149; Morris v. Williams, 8 Cir., 149 F.2d 703; Beal v. Holcombe, Mayor of Houston, 5 Cir., 193 F.2d 384; Briggs v. Elliott, D.C., 98 F.Supp. 529; Battle v. Wichita Falls Junior College, D.C., 101 F. Supp. 82. "It should be noted, * * * that all legal restrictions which curtail the civil rights of a single racial group are immediately suspect. * * * Pressing public necessity may sometimes justify the existence of such restrictions; racial antagonism never can." Korematsu v. U. S., 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194.

In light of the conclusions above reached we do not meet the issue of unconstitutionality of segregation *per se*, raised in the complaint.

An order will be entered under the several counts of the complaint declaring that the refusal of defendant Kansas City, Missouri, an arm of the State of Missouri, acting through its Board of Park Commissioners, to enter into and make contracts with plaintiffs for admission to the Swope Park swimming pool, in said city, and to refuse plaintiffs' admittance to said pool solely because of the race and color of plaintiffs, which right is granted to, used, and enjoyed by white persons, and not substantially provided for Negroes, is a deprivation of rights, privileges, and the equal protection of the laws secured to plaintiffs by the Fourteenth Amendment to the Constitution of the United States and Sections 41 and 43, T. 8, U.S.C.A. The order will contain an injunction against all defendants, except defendant William E. Kemp, as Mayor of said City, restraining them from so denying to plaintiffs such constitutional rights. This action shall stand dismissed without prejudice as to defendant William E. Kemp, as Mayor of Kansas City, Mo. (Counsel prepare decree.)

It is so ordered.